**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Skin Savvy Aesthetics LLC, et al., | No. CV-26-02332-PHX-KML |
| Plaintiffs, | **ORDER** |
| v. | |
| Panobit LLC, et al., | |
| Defendants. | |

Plaintiffs Skin Savvy Aesthetics LLC and Crystal Clean Window Team LLC (collectively "Skin Savvy") hired defendant Panobit LLC ("Panobit") to provide IT services. In January 2026, Skin Savvy informed Panobit it would be terminating the business relationship. The parties disputed the terms of this termination (and accompanying transfer of digital assets and control), and on April 1, 2026, Panobit shut down Skin Savvy's website, servers, and email accounts. Skin Savvy now seeks a temporary restraining order and preliminary injunction that would primarily require Panobit to restore its digital infrastructure. (Doc. 7.)

## I.    Factual Background

Between July 2, 2013 and December 31, 2025, Skin Savvy, a medical aesthetics practice, purchased, maintained, and renewed six domain names through its principal Samuel Heffner. (Doc. 7-2 at 7-8, 16-38.) Each was purchased with Skin Savvy funds, used exclusively for Skin Savvy purposes, and registered in Heffner's name. (Doc. 7-2 at 8.)

In October 2022, Skin Savvy executed a written Letter of Agency authorizing IT

servicer Cynaxa to manage its IT services and act on its behalf "regarding domain names, web hosting, and other technology services." (Doc. 7-2 at 8.) That authorization was valid until October 2025 or written notice terminating Cynaxa's services. (Doc. 7-2 at 8.) Cynaxa employee James Staricha managed this relationship, and when he left Cynaxa to become the principal of Panobit, he continued to provide these services to Skin Savvy. (Doc. 7-2 at 8.) Skin Savvy admits it did not execute a written agreement with Panobit (Doc. 7-2 at 8), though Staricha in his own capacity provides a May 5, 2025 Letter of Agency authorizing Panobit to act on Skin Savvy's behalf for IT needs (Doc. 11 at 5).

Over the course of the business relationship, Skin Savvy gave Cynaxa (and later Panobit) management capabilities for all its domain names, and Skin Savvy's emails and phone system were hosted on Panobit's servers and under Panobit's control. (Doc. 7-2 at 9.) Panobit's control was "strictly custodial" for administrative and maintenance purposes; Panobit has not claimed it owns the assets. (Doc. 7-2 at 9, 47-48.)

On August 9, 2026, Heffner wrote to Panobit terminating its role as Crystal Clean Window Team's IT provider, after which Panobit agreed to transfer and shut down Crystal Clean's services. (Doc. 7-2 at 9-10.) On January 15, 2026, Heffner wrote to Panobit terminating its role as Skin Savvy's IT provider, effective March 31, 2026. (Doc. 7-2 at 10, 57.) Skin Savvy had around that time hired a new IT company, the Maynard Group. (Doc. 7 at 5.) Panobit responded the next day, demanding certain conditions be met before it would turn over control of Skin Savvy's digital assets and cooperate with the transition to the Maynard Group: Skin Savvy would need to sign a liability release, pay $175/hour offboarding fees, conduct in-person meetings with Panobit, and pay meeting cancellation fees. (Doc. 7-2 at 10.) Skin Savvy communicated its refusal to submit to these terms, which allegedly exceeded the parties' agreement. (Doc. 7-2 at 10.)

In the following weeks, Panobit refused to cooperate with the transition, conditioning its "release of Skin Savvy's credentials on a signed liability release, settlement of disputed balances, and equipment return." (Doc. 7-2 at 10-11.) It refused to provide credentials to the Maynard Group, causing additional costs and delays regarding firewall

access. (Doc. 7-2 at 10.) It did not transfer control over Skin Savvy's phone numbers. (Doc. 7-2 at 10.)

In early March 2026, Skin Savvy notified Panobit it would be initiating chargebacks for two charges Panobit had made on Skin Savvy's credit card: one for $2,156.87 that "Staricha admitted was unintentional" and another for $695.50, which Panobit made after Skin Savvy had in writing revoked Panobit's billing authorization. (Doc. 7-2 at 11, 59-62.) Panobit responded by demanding Skin Savvy withdraw the chargebacks or Panobit would terminate all Skin Savvy services, including the phone system, emails, and websites. (Docs. 7-1 at 11; 7-2 at 59.) After Skin Savvy sent Staricha a formal demand letter regarding these disputes, Panobit shut down Skin Savvy's phone system during business hours. (Doc. 7-1 at 11.) On March 20, 2026, Panobit demanded Skin Savvy resolve certain balances and sign a release. Skin Savvy declined. On April 1, 2026, Panobit disabled Skin Savvy's website, servers, and email accounts, explaining it did so "in response to chargebacks and non-payment." (Docs. 7-1 at 11; 7-2 at 47-52.)

Skin Savvy's websites remain offline and its email accounts remain disabled; additionally, Panobit has unilaterally changed the contacts for certain domain names from Heffner to Panobit. (Doc. 7-2 at 11, 65). Another domain name is not receiving emails, which are unrecoverable. (Doc. 7-2 at 12.) Skin Savvy is unable to communicate with existing patients, cannot access years of patient communications, vendor records, and financial documentation, and is unable to determine whether Panobit has permanently deleted any or all of this data. (Doc. 7-2 at 12.)

Skin Savvy also alleges a hacker gained access to Heffner's personal iCloud account and "selectively deleted emails" connected to this litigation. (Doc. 7-2 at 13.) According to Skin Savvy, the hacker was most likely Panobit. (Doc. 7-2 at 13.)

Skin Savvy filed a lawsuit on April 6, 2026, alleging violations of the Computer Fraud and Abuse Act ("CFAA"), tortious interference with business expectations, breach of the implied covenant of good faith and fair dealing, and conversion. (Doc. 1 at 9-15.) On April 9, 2026, Skin Savvy filed a motion for a temporary restraining order without

notice, asking the court to require Panobit to fully restore Skin Savvy's websites and IT systems; "take all steps necessary to transfer" all domain name rights, credentials, and control relating to Skin Savvy's technical infrastructure, including access rights necessary for Skin Savvy to "assume exclusive control over its domain names"; refrain from altering, disabling, or allowing to lapse any digital accounts or services; and preserve evidence of its use of Skin Savvy's digital assets, including those belonging to Heffner. (Doc. 7 at 3-4.) The court declined to issue the temporary restraining order without notice and ordered a response. (Doc. 9.) Staricha responded on his own behalf but Panobit did not retain counsel to file a response before the deadline. (Doc. 13.) A temporary restraining order is granted.

## II.    Legal Standard for Early Injunctive Relief

Generally, a court analyzes a request for a temporary restraining order under two slightly-different tests. First, it must evaluate if there is a likelihood of success on the merits, if there is a likelihood of irreparable harm, whether the balance of equities tips in the movant's favor, and whether an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2009). A court typically must also assess whether "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor" in addition to showing "a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

Skin Savvy seeks relief in the form of a temporary restraining order primarily requiring Panobit to restore Skin Savvy's websites and IT systems and transfer access and administrative control over those systems. (Doc. 7 at 4.) Awarding such relief would take the form of a "mandatory injunction" because Panobit would be ordered "to take action." *N. D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024) (simplified); *see Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022) (a mandatory injunction "goes beyond simply maintaining the status quo"). "To obtain a mandatory injunction . . . a plaintiff must establish that the law and facts clearly favor her position, not simply that she is likely to succeed." *Id.*; *see*

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (requiring showing of "extreme or very serious damage" and that the injury is not compensable with damages). The Ninth Circuit has implied the *Alliance for the Wild Rockies* sliding-scale inquiry is not appropriate for mandatory injunctions. *Snyder*, 28 F.4th at 112 n.4; *see Johnson v. Nat'l Collegiate Athletic Ass'n*, No. CV 25-60-M-KLD, 2025 WL 1790345, at *7 (D. Mont. June 26, 2025). Only the *Winter* test is applied below.

### III.    Analysis

#### A.  Likelihood of Success

Skin Savvy's first requirement for obtaining relief is to make a "clear showing" it is likely to succeed on the merits. *Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 911 (9th Cir. 2021). It argues it is likely to succeed on all of its claims. Based on the available evidence and Panobit's failure to respond to Skin Savvy's arguments, Skin Savvy has made the requisite showing for at least one claim—tortious interference with business expectations—which is sufficient to satisfy *Winter*'s first prong. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 n.3 (9th Cir. 2014).

#### i.        Tortious Interference with Business Expectations

To prove a claim for tortious interference with business expectations, a plaintiff must allege (1) a valid business expectancy; (2) knowledge of the expectancy; (3) intentional interference that induced or caused termination of the expectancy; (4) damage as a result; and (5) improper conduct. *Dube v. Likins*, 167 P.3d 93, 99-100 (Ariz. Ct. App. 2007); *see Neonatology Assocs., Ltd. v. Phoenix Perinatal Assocs. Inc.*, 164 P.3d 691, 693-94 (Ariz. Ct. App. 2007) (discussing seven-factor analysis to determine impropriety of conduct).

Skin Savvy has shown a clear likelihood of success on this claim. It lists as business expectancies its relationships with current and prospective patients, referral sources, and marketing partners, alleging each made up a significant part of its business. (Doc. 1 at 11.) It further alleges Panobit knew of these business relationships through its work as Skin

Savvy's IT provider and intimate engagement with Skin Savvy's entire business operation. (Doc. 1 at 11.) Next, the "intentional interference" is clear: Panobit first cut Skin Savvy's phone lines and later disabled its entire website and email system, making it impossible for Skin Savvy to function or operate within its existing patient, sourcing, and vendor relationships, let alone engage with new customers' business expectancies. (Doc. 1 at 11.) This caused damage, including loss of goodwill and reputation. (Doc. 1 at 11-12.) Skin Savvy also alleges Panobit's actions were extortionary because the shutdown was conditioned on Skin Savvy making certain payments and ceasing to contest the chargebacks, "designed to harm Skin Savvy's business operations," retaliatory, and directly harmful. (Doc. 1 at 13.) This meets Arizona's test for improper conduct. *Neonatology Assocs.*, 164 P.3d at 694.

Accordingly, Skin Savvy has shown a clear likelihood of success on this claim.

## B. Likelihood of Irreparable Harm

Having established Skin Savvy is likely to succeed on at least one of its claims, the next issue is whether Skin Savvy has established a likelihood it will suffer irreparable harm. Skin Savvy alleges "[e]very day in which [its] digital infrastructure remains offline, [it] suffers additional and compounding harm to its reputation, patient relationships, and prospective customer base." (Doc. 7-2 at 13.)

Economic harm "is not generally considered irreparable." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). But "[t]he threat of being driven out of business is sufficient to establish irreparable harm." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022). Additionally, when a plaintiff provides "specific evidence that its reputation and goodwill [are] likely to be irreparably harmed," this more-intangible injury may also qualify as irreparable. *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 761 (9th Cir. 2018); *see also Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

Skin Savvy is digitally unavailable to its patients and prospective customers and it cannot access its own websites or emails; the business's entire public electronic front is

shut down. (Doc. 7-2 at 12.) Skin Savvy has sufficiently alleged this is "actively destroy[ing]" its reputation and goodwill among patients and customers such that its future is at risk. (Doc. 7-2 at 13.) For instance, customers who find Skin Savvy is offline will likely choose a competitor or believe it is unreliable or out of business. (Doc. 7-2 at 12.) Patients and vendors will likely believe the business has closed without warning and may leave negative reviews or terminate their relationship with Skin Savvy. (Doc. 7-2 at 12.) There also may be risk not only to patient relationships, but to patient health; Skin Savvy's inability to communicate with patients means it may miss "urgent concerns" like post-treatment infections or complications. (Doc. 7-2 at 13.) That this reputational injury "does not readily lend itself to calculable money damages" further supports a finding of irreparable injury. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).

Skin Savvy has shown it will suffer "extreme or very serious damage" absent relief. *Marlyn Nutraceuticals Assocs.*, 571 F.3d at 879.

### C.  Balance of Equities

The court must also "weigh the damage to each [party] in determining the balance of the equities." *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 852 (9th Cir. 2019) (simplified). The "damage to each" is measured as "the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

Skin Savvy alleges refusing an injunction will cause grave harm to its reputation, goodwill, and the future of its business. (Doc. 7-2 at 12.) It is currently suffering harm that is either irreparable or it will be if it continues. In contrast, the harm (if any) Panobit suffers from being forced to restore Skin Savvy's digital infrastructure would be minimal economic harm from the time spent on that work. Accordingly, granting this injunction places Panobit at very little risk while withholding the injunction places Skin Savvy at risk of significant reputational damage that only increases with time. The balance of equities favors Skin Savvy.

### D.  Public Interest

"When the reach of an injunction is narrow, limited only to the parties, and has no

impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009).

Though Skin Savvy concedes "there is no indication that the impact will reach beyond the parties and injure the public in any fashion" (Doc. 7 at 16), its allegations regarding Skin Savvy's patients' disrupted medical communications suggest Skin Savvy's patients may benefit from a TRO. Regardless, Skin Savvy's allegations that there is a public interest in upholding the law are sufficient to find this a neutral factor. *See Henry Schein, Inc. v. Cook*, 191 F.Supp.3d 1072, 1078 (N.D. Cal. 2016) (public interest is served when injunction requires defendant "to do no more than abide by trade laws and the obligations of contractual agreements").

### E.  Balance of Hardships

A temporary restraining order is "an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. But Skin Savvy has shown a likelihood of success on at least one of its claims. Panobit will not suffer significant hardship from restoring Skin Savvy's digital infrastructure or transferring access to Skin Savvy's new IT provider, both of which appear to be actions Panobit must take in order to comply with the law. *See Cook*, 191 F.Supp.3d at 1077 (balance tips toward TRO where plaintiff alleges it will suffer irreparable harm while defendant would be prohibited only from engaging in improper activity); *Dish Network L.L.C. v. Ramirez*, No. 15-CV-04712-BLF, 2016 WL 3092184, at *7 (N.D. Cal. June 2, 2016) (same).

### IV.    Conclusion

Skin Savvy showed a clear likelihood of success on the merits of its tortious interference with business expectancy claim and established clear and serious irreparable harm which would not be compensable with a damages award alone. It has made a sufficient showing of the *Winter* factors and its motion for a temporary restraining order is granted.

## V.    Bond

Although the court has discretion not to order a bond, it declines to waive bond here. *See* Fed. R. Civ. P. 65(c) ("The court may issue . . . a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully . . . restrained."). The relief granted in this order is conditioned upon the posting of security in the amount of $5,000 for payment of such costs and damages as may be incurred or suffered by Panobit in the event it is later found to have been wrongfully restrained.

**IT IS ORDERED** the Motion for Temporary Restraining Order (Doc. 7) is **GRANTED**.

**IT IS FURTHER ORDERED** upon Skin Savvy's posting of security, Panobit must (1) fully restore Skin Savvy's websites, emails, and other IT systems to fully operational status; (2) take all steps necessary to transfer to Skin Savvy all rights, titles, control, custody, and administration associated with its domain names; (3) provide Skin Savvy with all credentials and other permissions, information, or access rights necessary to enable Skin Savvy to assume exclusive control over its domain names; (4) transfer to Skin Savvy all credentials, access, and administrative control relating to Skin Savvy's technical infrastructure; (5) refrain from altering, disabling, redirecting, transferring, deleting, allowing to lapse, modifying, impairing, or otherwise interfering with the subject domain names, associated websites, DNS records, hosting configurations, email settings, or any related digital assets, accounts, or services; and (6) preserve all evidence of its current and past use of Skin Savvy's websites, emails, phones, and all other digital IT assets, including the digital assets of Samuel Heffner.

/

/

/

/

/

**IT IS FURTHER ORDERED** this order shall expire fourteen days after issuance unless it is extended by subsequent order.

Dated this 14th day of April, 2026.

**Honorable Krissa M. Lanham**
**United States District Judge**